[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff, whose maiden name is Judith Robison, and the defendant were married in New York City, New York on January 6, 1953. Both parties have resided continuously in the State of Connecticut for at least twelve months immediately prior to the date of the filing of the complaint. The marriage between the parties has broken down irretrievably without any reasonable prospects for reconciliation. There are no minor children issue of the marriage, and the plaintiff does not presently have any minor children. The parties do have one adult child, born March 27, 1965. Neither party has received assistance from the State of Connecticut.
The parties met when they were both in college. They married when the plaintiff was twenty-one and the defendant was twenty-two years old. They had known each other for approximately three years, having met in their sophomore year in college. At the time of their marriage, the defendant was in the army where he remained for CT Page 4022-K approximately two years, with the parties living in Arkansas. After his discharge from the army, the parties moved to Greenwich Village in Manhattan.
When the parties married, neither party had any substantial assets.
The plaintiff was born on July 14, 1931. The plaintiff is in general good health. She has had asthma for most of her life that had a flare-up approximately five years ago. Her asthma is presently under control.
The plaintiff is employed by the Regional Hospice of Western Connecticut. Her occupation is a bereavement coordinator and pastoral care coordinator. She is also a deacon in the Episcopal Diocese of Connecticut. She has worked full-time at the regional hospice for approximately one year. The plaintiff's employment with Regional Hospice was for a specific project that will terminate in June of 1997. She has been employed at the hospice since 1988 regarding pastoral care.
In the fall of 1981, the plaintiff enrolled in the Yale Divinity School for two years. Tuition was approximately $5200 for the two years. After graduating from the Yale Divinity School in 1983, she received further training at a cost of approximately $2400. She became ordained as a deacon in December of 1986. She intends to give up her job as bereavement coordinator in June of 1999. She will be eligible for social security benefits at age sixty-five, receiving $235 monthly.
Her gross income for the calendar year 1995 from the regional hospice was $26,911.54. Her gross weekly earnings from the regional hospice for the calendar year 1995 was an average of $535.15, and her net weekly wages was $411.76. In addition, she has income from her pastoral duties of $67.30 weekly for a net weekly income from all sources of $479.06.
Neither party show on their respective financial affidavit any paintings. There are a total of five paintings that are owned by the parties. Plaintiff's financial affidavit shows various monthly payments for mortgage and taxes of $861.50; home equity loan (interest only) $190.74; insurance $70.66; utilities consisting of electricity and partial heat $182; water $66.75; telephone $50; gas/oil $120; garbage removal $28.75; and cable TV $68. It also shows interior/exterior maintenance of $170 estimated; repairs for plumbing $30; lawn/snow $70; and other exterminator $46. Those expenses are the total expenses for the family home and not just the plaintiff's one-half share. The breakdown of the mortgage and taxes of $861.50 includes taxes on the home that total CT Page 4022-L approximately $4200 annually. The plaintiff has $150 in medical and dental bills monthly. That represents the deductible and uncovered expenses of her insurance through her employment provided by Travelers Insurance Company. The cost of the defendant's supplemental insurance under medicare is $120 quarterly. The defendant is not seeking COBRA coverage through the plaintiff's health insurance. The weekly expenses shown on her affidavit for transportation are for her vehicle only.
The parties stipulate that the current real estate taxes on the family home are $6093.84, and that its assessed value is $325,640.
The defendant was born on September 27, 1930. The defendant presently has atrial fibrillation. The defendant also has thrombosis behind his left eye, which causes him some difficulty in reading music. He also has gout, as well as chronic lymphocytic leukemia.
The defendant has been a free-lance worker for most of his adult life. His primary profession is that of a musician. He is world famous in playing the harpsichord. In approximately 1957 or 1958, the defendant's father purchased a harpsichord for the defendant. He took lessons and turned professional in approximately 1981 as a harpsichordist. He was also doing free-lance work in reviewing music. The plaintiff was also involved in doing music reviews for the New York Herald Tribune during the period of approximately 1962 and 1963. During the late 1960's and early 1970's, the defendant on some occasions would be engaged in doing many concerts, and during other times he had very few concerts. During the time he had few concerts, he also gave music lessons and was writing music. He obtained the job as an assistant professor of music at Fairfield University. In approximately 1975, there was a great increase in the number of concerts that he was performing. He stopped working at Fairfield University in approximately 1977 or 1978. The defendant is highly respected in his field and still performs concerts at the present time. He recently finished a harpsichord dictionary and is currently working on a harpsichord book.
The defendant performs concerts all over the world. He also teaches harpsichord. He writes for various music magazines. He has recorded approximately eighty records, fifty-five of which are solo records. He has also done radio programs.
The defendant presently has thirty-four concerts scheduled for the calendar year 1996. Most of them are in the United States, and one is in Hong Kong. The Hong Kong fee has been set at $6000. Other fees CT Page 4022-M range as low as $300. He will pay a 15 percent commission on the Hong Kong concert. He also pays his own airfare and living expenses while in Hong Kong for two days. He has one concert scheduled in New York in November of 1996 with a gross fee of $1250.
The defendant's taxable income for the calendar year 1995 consists of the following.
 1099 Miscellaneous Income $ 10,218.90 Concert Income 15,577.84 Dividend Income 501.38 Interest Income 250.00 Lesson Income 1,425.00 Other 2,263.66 Principal 4,077.09 Reimbursements 781.02 Royalties 786.41 Social Security 3,765.00 Trust Income 33,431.47
TOTAL $ 73,077.77
The defendant's financial affidavit shows business deductions in the monthly amount of $1,520.91. The court finds that the actual business deduction should be $5,124 annually or $427 monthly.
The defendant personally owns three harpsichords, a Forte piano and a clavichord. They were all acquired during the time the parties were married. He also has a library and recording and books with a value of $5000.
The defendant's financial affidavit, dated January 30, 1996, shows an ownership in thirty-seven and one-half shares in Epiphany Recordings with a value of $1. Epiphany Recordings is his son's company. He invested $5000 in the company. It is a privately held company. The shares do not have any value at the present time. The company does have four recordings on the market in which the defendant is involved in three of the recordings. The defendant is the artist and repertoire director in the company, but does not receive any money for his work. His affidavit also shows an investment in a limited partnership known as PLM Income Partners. PLM is in the business of leasing out construction equipment to businesses. He invested $5000 in that business approximately six to seven years ago. The value of that investment is $5000. His financial affidavit under income shows gross monthly income of $62.62 from investments. That is the income from his CT Page 4022-N investment in PLM. The term residuals refers to a repeat of a prior television program or other entertainment for which the person received compensation. The defendant does not presently have any residuals. Residuals are not the same as royalties. The defendant does have royalty income as shown on his financial affidavit of $65.53 monthly.
Royalties come from various publications, as well as some record sales. The royalty can be as much as 10 percent of the retail sale price after expenses are first deducted. The defendant's financial affidavit values his music instruments at $65,000. The court finds from the evidence presented that the total value of those instruments is $100,000. His current financial affidavit also shows a deferred compensation plan with Local 802. He has been a member of Local 802 for over thirty-five years.
The parties are in dispute as to the cause of the breakdown of the marriage.
From all of the evidence presented, the court finds that the primary cause of the breakdown of the marriage has been the defendant's repeated sexual affairs with numerous women that has continued up to the present time, as well as his emotional abuse to the plaintiff. The plaintiff first learned of the defendant's affairs in 1971. At the time the defendant filed for divorce in 1985, the plaintiff learned that he was involved in an affair with a woman in California. The defendant filed for divorce in 1985 so that he could go to California to live with that woman. The plaintiff filed a cross complaint. After learning of his affair with the California woman, the plaintiff, nevertheless, attempted reconciliation with the defendant in 1986 and the divorce action was withdrawn. The parties agreed to attempt reconciliation with the plaintiff imposing three stipulations: (1) joint marriage counseling; (2) psychiatric counseling for the defendant; and (3) no more affairs by the defendant. The defendant continued to have affairs following the reconciliation. By early 1995, the plaintiff learned that the defendant was involved with another affair with a particular woman. She suspected that he was having an affair by June of 1994. In September of 1994, the plaintiff learned that the defendant had a post office box in his name only, that he used to correspond with various women. On or about December 14, 1994, the plaintiff came into possession of various photographs and tapes that were in the defendant's briefcase. The photographs were nude photographs of the defendant and another woman engaged in various sexual activities. Upon finding the photographs, the plaintiff decided that she would file for divorce.
The defendant admits to having had sexual relations with CT Page 4022-O approximately thirty different women during the course of the marriage, commencing in 1964 and up to the present time. The defendant's relationship with the woman he is presently involved in commenced while the plaintiff and the defendant were still in marriage counseling.
The parties still reside in the family home together. The family home, owned by the parties, at 20 Drummer Lane, West Redding, Connecticut, is the first real estate that the parties purchased. It was purchased on May 7, 1971, at a cost of $56,000. The down payment of $24,000 came from the defendant's father. The parties obtained a mortgage from People's Bank for $35,000. There are only two monthly payments left on the mortgage as of January 30, 1996.
The plaintiff claims that the fair market value of the home is $375,000. The defendant claims that the fair market value of the home is $286,000. From the evidence presented, the court finds that the fair market value of the home is $330,000.
The parties obtained an open-end home equity loan, not to exceed $50,000, on December 9, 1994. During the calendar years 1995 and 1996, the parties used a home equity line of credit for the following purposes: (1) January 4, 1995 attorney's fees for plaintiff $5000; (2) November 6, 1995 attorney's fees for plaintiff $2000; (3) January 3, 1996 attorney's fees for plaintiff $4500; (4) December 1, 1995 attorney's fees for defendant $3000; (5) September 6, 1995 appraisal fees for plaintiff $400. The plaintiff has thus used $11,900 of the home equity loan in this dissolution action, and the defendant has used $3000 with a difference of $8,900.
The plaintiff's financial affidavit shows the home equity loan balance to be $49,000. The current balance on that loan is $49,400. The defendant did not consent to the plaintiff withdrawing funds from the home equity loan for the payment of attorney's fees.
The parties constructed an addition to the family home during the period of 1980 to 1981. The addition consisted of a studio for the defendant and a balcony that the plaintiff wanted. The cost of the studio and balcony was approximately $110,000. The defendant's mother had died in 1980, leaving various bank accounts that were in her name, in the plaintiff's name and in the defendant's name. Those bank accounts were used to pay for the addition. The purpose of building the studio was to have a place for the defendant to practice his music.
Upon the death of the defendant's mother in 1980, and the defendant's father in 1978, each parent left a trust. CT Page 4022-P
FATHER'S TRUST
Under the terms of the defendant's father's last will and testament, a trust was set up for the defendant's mother if she were to survive his father. The net income from the trust was to be paid to the defendant's mother at least quarterly during her lifetime. Upon her death, the net income from the trust was to be paid in installments of at least quarterly to the defendant during his lifetime, and upon his death, was to be paid to the adult child of the parties. After the death of the defendant's mother in April of 1980, the net income from his father's trust was paid to the defendant.
During the calendar year 1995, the trust had common fund income totalling $3,781.75; dividend income totalling $13,123.47; and interest income totalling $5,034.44. During the calendar year 1995, the trust made distribution payments to the defendant totalling $20,036.63. The market value of all of the assets in the trust as of December 31, 1995 is $463,825.
MOTHER'S TRUST
Under the terms of the defendant's mother's will, a trust was set up that provided that in the event the defendant and the plaintiff or either of them should survive his mother, then while either of them is living, the trustee was authorized to pay over to either the defendant, the plaintiff, and the defendant's issue living, from time to time, such amounts of income and principal of the trust as the trustee determines, in the sole discretion of the trustee, for the education, comfort, support and maintenance of any of the group of beneficiaries. Since the death of the defendant's mother, all of the income from the trust has been paid over to the defendant only.
During the calendar year 1995, the trust had dividend income of $10,217.88; interest income of $3,887.39; and common fund income of $1,006.62. The total market value of the trust assets as of December 31, 1995 were $341,612.90. During the calendar year 1995, the trust made distributions to the defendant totalling $13,394.84, plus the $4000 distribution from principal.
On February 15, 1995, a $4000 distribution from principal was made to the defendant from the trust, as the parties needed additional funds to pay their February bills.
This court has considered the provisions of § 46b-82 regarding the CT Page 4022-Q issues of alimony, and has considered the provisions of § 46b-81(c) regarding the issues of property division, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders:
A. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF ALIMONY
1. The defendant is ordered to pay to the plaintiff alimony as follows:
(a) One ($1) dollar per year plus.
 (b) One-half of the net income that he receives from his father's trust. The defendant shall instruct the trustee to make said one-half payments directly to the plaintiff instead of receiving them himself and, in turn, having to make the required payments to the plaintiff. He is to notify the trustee of this requirement in writing within fifteen days of the date of this decision, and provide a copy of such notification to the plaintiff and to the plaintiff's attorney within said fifteen days plus.
 (c) One-half of the income and principal that is paid to him by the trustee from his mother's trust. The defendant shall instruct the trustee to make said one-half payments of income and principal directly to the plaintiff instead of receiving them himself and, in turn, having to make the required payments and distributions to the plaintiff.
 (d) To the extent that any of the income under paragraph 1(b) is non-taxable, the plaintiff is to receive one-half of said non-taxable income. To the extent that any of the income or principal is non-taxable under paragraph 1(c), the plaintiff is to receive one-half of such non-taxable income and principal.
2. Alimony under paragraphs 1(a) and 1(b) is to terminate on the earliest of the following events: (1) the death of the plaintiff; (2) the death of the defendant; and (3) the remarriage of the plaintiff. The provisions of § 46b-86(a) and § 46b-86(b) are applicable. CT Page 4022-R
3. The trust of the defendant's mother, known as the Mildred Kipnis trust, provides that the income may be paid to the plaintiff, the defendant, or their son. It further provides that upon the death of the defendant, this trust income does not necessarily cease for the plaintiff, but when both the plaintiff and the defendant are deceased, the remaining principal becomes the property of their adult son. The right of the plaintiff to continue to receive trust income or principal does not automatically terminate under this decision upon the death of the defendant. The trustee will continue to have the discretion to make payments to her in accordance with the trust instrument. Alimony under paragraph 1(c) does terminate upon the death of the plaintiff. Further, her right to receive one-half of the income and principal payments received by the defendant terminates upon her remarriage. The trustee will continue to have the discretion to make such income and/or principal payments to her in the event of her remarriage as the trustee, in his discretion, in accordance with the trust instrument, deems appropriate. The provisions of § 46b-86(a) and § 46b-86(b) are applicable to the alimony payments under paragraph 1(c).
C. BY WAY OF PROPERTY ORDERS
1. The 1990 Chevrolet shown on the plaintiff's financial affidavit that has a fair market value of $4300, and no loan, is awarded solely to the plaintiff.
2. The 1993 Buick shown on the defendant's financial affidavit that has a fair market value of $8000, and a loan of $11,738, is awarded solely to the defendant.
3. The First Fidelity Bank account shown on the plaintiff's financial affidavit with a balance of less than $100 is awarded to the plaintiff.
4. The People's Bank joint account shown on both the plaintiff's financial affidavit, and the defendant's financial affidavit, is awarded jointly and equally to the parties.
5. The cookbooks owned by the parties are awarded solely to the plaintiff.
6. Three harpsichords, one Forte piano, and two clavichords, with a fair market value of $100,000, are awarded to the defendant.
7. The library and recordings and books shown on the defendant's CT Page 4022-S financial affidavit are awarded to the defendant.
8. The defendant's financial affidavit shows life insurance with a cash surrender value, less loans, of $1388. The cash surrender value of that life insurance is $10,681 dollars. The court arrives at that amount from defendant's exhibit 11. That exhibit shows that the cumulative gross premiums are $15,865 and the current fund value is $10,681. The cash surrender value is the fund value less any indebtedness and surrender charges. The court orders that cash surrender value is assigned solely to the plaintiff. The plaintiff is hereby assigned the total ownership in the life insurance policy on the defendant's life. She is to hold the defendant harmless from paying the insurance premiums on such policy.
9. The thirty-seven and one-half shares owned by the defendant in Epiphany Recordings is ordered divided equally between the parties.
10. The interest that the defendant has in PLM Income Partners is divided equally between the parties.
11. The interest that the defendant has in the Local 802 plan is ordered divided equally between the parties.
12. The five paintings owned by the parties are ordered divided as follows: The plaintiff can pick the first painting, the defendant the second, the plaintiff the third, the defendant the fourth, and the plaintiff the fifth.
13. The court approves of the agreement between the parties that the furniture and furnishings that came from the respective families of the parties will be retained by that party, and for any item that is not agreed upon the court retains jurisdiction.
14. This court has found the fair market value of the family residence is $330,000. It is the intent of this decision to divide various assets approximately equally. After deducting the balance of the home equity line of approximately $49,400, that would leave a remaining equity of approximately $280,600. The court awards the first $80,419 of the equity in the family home to the plaintiff. The court arrives at that $80,419 by considering the value of the musical instruments of $100,000, less the cash surrender value of the life insurance policy ($10,681), and less the surplus amounts that the plaintiff withdrew from the home equity line for attorney's fees and appraisal fees ($8900). The remaining equity is to be split equally between the parties. The defendant shall have the option to purchase the plaintiff's interest in the CT Page 4022-T family home for a period of sixty days from the date of this decision. In the event he exercises that option, then he is to close on the property within sixty days of this decision, using the formula outlined above. All adjustments for real estate taxes and any other adjustments are to be handled as if the sale was completed to a third party. The court retains jurisdiction over any disputes that arises regarding such adjustments. Any capital gains tax that is due is to be divided equally between the parties. The parties shall have the right to continue to occupy the family residence together until such time as the residence is sold. In the event the defendant purchases the residence, then the plaintiff is to vacate the residence within thirty days after the closing is completed. In the event the defendant does not purchase the residence for $330,000 within sixty days of the date of the decision, then in such event the plaintiff shall have the right to purchase the defendant's interest in the family residence for the same $330,000 price at any time between sixty days and 120 days of this decision using the same formula previously outlined. All adjustments for real estate taxes and any other adjustments are to be handled as if the sale was completed to a third party. The court retains jurisdiction over any disputes that arises regarding such adjustments. In the event the plaintiff purchases the family residence, then the defendant shall vacate the residence within thirty days after completion of such purchase, and the parties shall divide equally any capital gains tax arising from the sale of the residence until the home is sold. In the event neither party purchases the residence as provided for herein, then the residence shall be listed for sale and the court shall retain jurisdiction over any disputes that may arise involving such sale. Under any of the circumstances outlined herein, the parties shall have the right to continue to occupy the residence together and shall be responsible for paying equally all costs that are involved in maintaining the residence until the date of closing.
D. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either the plaintiff or the defendant.
E. MISCELLANEOUS ORDERS
1. The parties are ordered to exchange copies of their federal and state income tax returns within thirty days after such returns have been filed, by certified mail, return receipt or registered mail, return receipt, for so long is there is an outstanding alimony order.
2. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature and CT Page 4022-U filing.
Axelrod, J.